

IN THE UNITED STATES DISTRICT COURT
FOR MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF APPLE IPHONE 6S AND APPLE IPHONE 7 PLUS, CURRENTLY LOCATED AT 31 HOPKINS PLAZA, 6TH FLOOR, BALTIMORE, MD | Case No.  17 - 3 3 4 1  JMC |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, James Jenkins, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession and which are further described in Attachment A, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the U.S. Department of State, Diplomatic Security Service (DSS), and have been employed by the Department of State since September 2011. I am presently assigned to the Document and Benefit Fraud Task Force in Baltimore, MD. This squad investigates, among other things, document fraud, benefit fraud, passport fraud, and visa fraud. I am empowered under 22 U.S.C. § 2709 to apply for and serve federal arrest and search warrants.

3.      The facts set forth in this affidavit are known to me as a result of my participation in this investigation, from information provided to me by other law enforcement officers and government officials, and from documents, records, and other evidence obtained during this

17 - 3 3 4 1 JMC

investigation. Since this affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and it does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

4.    The property to be searched is (1) an Apple iPhone 6S, International Mobile Equipment Identity 353255071996410 (hereinafter "Device 1") and (2) an Apple iPhone 7 Plus, International Mobile Equipment Identity 356571082130709 (hereinafter "Device 2") (collectively the "Devices"). The Devices are currently at Homeland Security Investigations (HSI) Baltimore located at 31 Hopkins Plaza, 6th Floor, Baltimore, MD and are also described in Attachment A.

5.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 371 (conspiracy) and 8 U.S.C. § 1325(c) (Marriage Fraud) (collectively referred to as the "Target Offenses") have been committed by Bal KC and others.  There is also probable cause to conduct a forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6.    In or around 2014, investigators learned that there were indications that Mohan THAPA, a Nepalese citizen living in the Baltimore area, was arranging fraudulent marriages. Specifically, evidence suggested that THAPA was arranging marriages between Nepalese citizens and U.S. citizens for the purpose of obtaining U.S. immigration status for the Nepalese citizen.

2

17 - 3 3 4 1 JMC

7.       In or around November 2015, the Department of Homeland Security (DHS)

conducted an I-9 inspection at Masala Kitchen located at 3105 St Paul St., Baltimore, MD.

Masala Kitchen is a restaurant associated with THAPA. The form I-9 is titled Employment

Eligibility Verification and documents an employee's authorization to work in the U.S.

Employers are required to keep the I-9s on file for a period of time and make the available for

inspection. An I-9 inspection involves DHS reviewing those forms. Among the employees

listed on the I-9s was Bal KC. Review of KC's immigration history showed that he obtained

immigration status through marriage to a U.S. citizen in Baltimore, MD. Investigators began

looking into the marriage and determined the following:

8.       On or about October 20, 2014, Jasmine BENNETT, a U.S. citizen, married Bal

KC, a Nepalese citizen, in Towson, MD.

9.       On or about August 3, 2015, BENNETT filed a petition with U.S. Citizenship and

Immigration Services to obtain immigration status for KC based on their marriage.

10.      On or about December 22, 2015, KC was granted conditional residency based on

his marriage to BENNETT.

11.      On or about March 20, 2017, I participated in a proffer session with Cooperator 1,

a witness known to law enforcement and knowledgeable about the marriage between KC and

BENNETT. Among other things, Cooperator 1 said that BENNETT was approached by KC and

THAPA at Mondawmin Mall in 2013. THAPA tried to convince BENNETT to marry KC during

this encounter. THAPA told BENNETT that KC needed help which BENNETT understood

meant with immigration. THAPA told BENNETT that she would not have to worry about

anything financially.

3

17 - 3 3 4 1 JMC

12.    According to Cooperator 1, BENNETT subsequently met with THAPA alone and he told her that KC would help her financially. BENNETT did not decide to marry KC at that meeting. According to Cooperator 1, THAPA and KC called BENNETT every day until she agreed to go through with the marriage.

13.    According to Cooperator 1, after BENNETT agreed to marry KC, KC and THAPA continued to call BENNETT during the period between agreeing and the marriage to make sure she did not change her mind.

14.    A Department of State Investigative analyst tabulated toll records for 917-513-5026, the phone number KC listed on his I-485, Application to Register Permanent Residence or Adjust Status. Each toll is a record of a call or text either incoming or outgoing on a particular phone number. The analyst determined that between October 13, 2014 and February 10, 2016 there were 316 tolls between KC and 443-522-1378, a number attributed to BENNETT through phone company subscriber records. The analyst further found that between April 22, 2014 and February 8, 2016 there were 815 tolls between KC and 443-572-9972 and 443-571-7392, two numbers linked to THAPA through phone company subscriber records.

15.    On or about September 18, 2017, I interviewed Cooperator 1 again. Cooperator 1 said that KC had been calling BENNETT recently and BENNETT agreed to meet with KC due to his persistence. BENNETT and KC met in a Target parking lot. KC showed BENNETT a letter she believed was from immigration stating that he had 90 days to respond. According to Cooperator 1, KC wanted to add BENNETT to his life insurance policy and his lease. BENNETT declined. KC also asked to take pictures together. I believe these requests from KC were for the purpose of making their marriage appear to be a bona fide marriage.

4

17 - 3 3 4 1 JMC

16.     Cooperator 1 said that KC communicates with BENNETT via text message and phone calls. Cooperator 1 forwarded me a screenshot of a text message exchange between KC and BENNETT. The screenshot showed that it was from the phone number 917-513-5026 and is listed as "K C." The screenshot of the message exchange reads:

KC: Your occupation specify ))). baby (((. I'm cook now

KC: N you

KC: Baby ???

KC: Your occupation baby ??

KC: Text me

KC: Hi

BENNETT: CNA

BENNETT: Certified nursing assistant

BENNETT: Yes work address is fine

KC: Thanku

17.     I believe the text message exchange is evidence of a lack of basic knowledge between KC and BENNETT that one would typically expect in a marital relationship.

18.     On or about November 9, 2017, investigators searched BENNETT's phone and copied call logs and text messages from her phone.

19.     I reviewed the information from BENNETT's phone and was able to locate approximately 50 text messages between KC and BENNETT covering the time period June 7, 2017 to November 8, 2017. Of note, approximately 8 were from BENNETT to KC and the remaining approximately 42 were from KC to BENNETT.

17 - 3 3 4 1 JMC

20.     On or about November 13, 2017, I learned from Cooperator 1's attorney that KC had been calling BENNETT every day and BENNETT had to change her phone number.

21.     On or about November 16, 2017, I arrested KC. During the arrest of KC, investigators seized the Devices which KC identified as belonging to him. While examining the Devices in order to locate phone-specific numbers to document the Devices I observed the lock screens on both Devices. This review did not involve entering a password or unlocking the Devices. I saw that the two Devices had different photos as the background of the lock screen. Both photos appeared to be KC and BENNETT together.

22.     Finally, following THAPA's arrest in June 2017, no contact with KC was one of the conditions of his release. A Department of State Investigative analyst reviewed toll records for several phone numbers associated with THAPA. The analyst found 13 tolls from the THAPA associated numbers to 917-513-5026 (the number linked to KC in BENNETT's phone and listed on KC's I-485) during the period July 26, 2017 to September 22, 2017.

*Conclusion*

23.     Based on the information gathered during the investigation and presented in this affidavit, I believe that KC used the Devices to communicate with individuals associated with this investigation and to make arrangements in furtherance of his criminal activities. I further believe that the Devices holds evidence relevant to the investigation including logs of calls between investigation targets, photos, and text messages. Therefore I request that a search warrant be issued for the Devices.

6

17 - 3 3 4 1 JMC

## STATUS OF THE DEVICES

24.     The Devices are currently in the lawful possession of Homeland Security

Investigations (HSI) located at 31 Hopkins Plaza, 6th Floor, Baltimore, MD.  They came into

HSI's possession in the following way: when investigators executed an arrest warrant for KC

multiple cellular phones were in plain view during the protective sweep following arrest and

when agents accompanied KC to a bedroom to obtain clothing for him. Investigators asked KC

about two of the phones which he identified as belonging to him. Device 1 was located on a

dining table in the room in which KC was arrested. Device 2 was located on one of two beds in a

bedroom where KC led agents to obtain additional clothing for him.

## TECHNICAL TERMS

25.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

> a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular
>
>     telephone) is a handheld wireless device used for voice and data communication
>
>     through radio signals.  These telephones send signals through networks of
>
>     transmitter/receivers, enabling communication with other wireless telephones or
>
>     traditional "land line" telephones.  A wireless telephone usually contains a "call
>
>     log," which records the telephone number, date, and time of calls made to and
>
>     from the phone.  In addition to enabling voice communications, wireless
>
>     telephones offer a broad range of capabilities.  These capabilities include: storing
>
>     names and phone numbers in electronic "address books;" sending, receiving, and

7

17 - 3 3 4 1 JMC

storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to

8

17 - 3 3 4 1 JMC

store very large amounts of electronic data and may offer additional features such
as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its
current location. It often contains records the locations where it has been. Some
GPS navigation devices can give a user driving or walking directions to another
location. These devices can contain records of the addresses or locations involved
in such navigation. The Global Positioning System (generally abbreviated
"GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite
contains an extremely accurate clock. Each satellite repeatedly transmits by radio
a mathematical representation of the current time, combined with a special
sequence of numbers. These signals are sent by radio, using specifications that
are publicly available. A GPS antenna on Earth can receive those signals. When
a GPS antenna receives signals from at least four satellites, a computer connected
to that antenna can mathematically calculate the antenna's latitude, longitude, and
sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used
for storing data (such as names, addresses, appointments or notes) and utilizing
computer programs. Some PDAs also function as wireless communication
devices and are used to access the Internet and send and receive e-mail. PDAs
usually include a memory card or other removable storage media for storing data
and a keyboard and/or touch screen for entering data. Removable storage media
include various types of flash memory cards or miniature hard drives. This

9

17 - 3 3 4 1 JMC

removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

26.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://www.apple.com/iphone-7/specs/ and https://www.apple.com/iphone-6s/specs, I know that the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

28.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

10

17 - 3 3 4 1 JMC

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

c.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

d.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

29.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but

11

17 - 3 3 4 1 JMC

not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

30.    *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

31.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

James Jenkins
Special Agent
U.S. Department of State
Diplomatic Security Service

Subscribed and sworn to before me
on December ___, 2017

J. Mark Coulson
UNITED STATES MAGISTRATE JUDGE

FILED _____ ENTERED
LOGGED _____ RECEIVED

JAN 2 3 2018

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

12

17 - 3 3 4 1 JMC

## ATTACHMENT A

The property to be searched is (1) an Apple iPhone 6S, International Mobile Equipment Identity 353255071996410 (hereinafter "Device 1") and (2) an Apple iPhone 7 Plus, International Mobile Equipment Identity 356571082130709 (hereinafter "Device 2") (collectively the "Devices"). The Devices are currently at Homeland Security Investigations (HSI) Baltimore located at 31 Hopkins Plaza, 6th Floor, Baltimore, MD and are also described in Attachment A.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**      17 - 3 3 4 1 JMC

1.      Any and all records on the Devices described in Attachment A or their SIM cards that relate to violations of 18 U.S.C. § 371 and 8 U.S.C. § 1325(c), including but not limited to:

       a.  All telephone numbers and direct connect numbers of identities assigned to the device, including usernames and passwords and electronic mail addresses;

       b.  Call and direct connect history information including Internet Protocol addresses accessed by the device or accessing the device;

       c.  Stored photographs, videos and text messages;

       d.  Stored electronic mail, including attachments, and voice messages and other recordings;

       e.  Stored calendar records;

       f.  Web-browsing history and any stored web pages;

       g.  Stored documents and other files;

       h.  Stored geo-location information;

       i.  Data stored in any application;

       j.  Any and all contacts and associated telephone numbers.

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3.    **Law Enforcement Search Protocol**                                      17 - 3 3 4 1 JMC

A.  The law enforcement search shall be conducted pursuant to the following protocol in order to minimize to the greatest extent possible the likelihood that files or other information for which there is not probable cause to search are viewed.

B.  With respect to the search of any digitally/electronically stored information provided to law enforcement by forensic analysis, the search procedure by law enforcement may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

   a.  surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized;

   b.  opening or reading portions of files in order to determine whether their contents fall within the items to be seized;

   c.  scanning storage areas to discover data falling within the list of items to be seized, to possibly recover any such deleted data, and to search for and recover files falling within the list of items to be seized; and/or

   d.  performing key word searches through all electronic storage areas to determine whether occurrence of language contained in such storage areas exist that are likely to appear in the evidence to be seized.

2

17 - 3 3 4 1 JMC

C.  If after performing these procedures, the directories, files or storage areas do not reveal evidence of the above listed crimes or other criminal activity, the further search of that particular directory, file or storage area, shall cease.

3